IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BEACON TEXTILE UNIT-2, PANORAMA FASHION WEAR, B.R. FASHION WEAR, <br><br> Plaintiffs, <br><br> v. <br><br> JK GROUP, LTD., an Illinois corporation; MAHABUBUL KABIR; and NILA KABIR, <br><br> Defendants. | No. 09 CV 3301 <br><br> Judge Joan H. Lefkow |

**OPINION AND ORDER**

Beacon Textile Unit-2, Panorama Fashion Wear, and B.R. Fashion Wear (collectively, "plaintiffs") filed suit against JK Group, Ltd. ("JK Group"), Mahabubul Kabir ("Mahabubul"), and Nila Kabir ("Nila") (collectively, "defendants"). The sole count seeks damages for JK Group's breach of an implied contract for sale of T-shirts. Plaintiffs also seek to hold Mahabubul and Nila individually liable for JK Group's alleged breach.[1] Before the court are the parties' cross-motions for summary judgment. Plaintiffs seek summary judgment on liability of all defendants, while Mahabubul and Nila seek summary judgment on their own individual liability. For the reasons set forth below, plaintiffs' motion [#26] is granted in part and denied in part, Nila's motion [#31] is granted, and Mahabubul's motion [#34] is denied.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

---

[1] The plaintiffs are citizens of Bangladesh, whereas the defendants are citizens of Illinois, and the amount in controversy exceeds $75,000. The court thus has jurisdiction to hear this case based on diversity jurisdiction. 28 U.S.C. § 1332(a).

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Id.* While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id*. at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id*. at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

## BACKGROUND

**I.      The Parties**

Plaintiffs are Bangladeshi corporations owned by Faiz Ahmed and his brother. They design and manufacture apparel for sale worldwide. Their sales process is rather complex: Plaintiffs manufacture T-shirts using loans from Somali Bank. After producing the merchandise, plaintiffs send invoices, packing lists, and bills of lading to Somali Bank and ship the merchandise to the buyer – in this case, to JK Group in the United States. It then becomes the buyer's responsibility to retrieve the merchandise from the U.S. Customs Service ("Customs"). In order to obtain the shipment from Customs, the buyer must pay Somali Bank to obtain release authorization and the original bill of lading. After presenting these documents to Customs, the

2

buyer receives its order, and the transaction is complete.

In 2004, Mahabubul formed JK Group, an Illinois corporation, in order to import T-shirts from Bangladeshi manufacturers – including plaintiffs – and sell them to retailers in the United States. Mahabubul is the CEO and secretary of JK Group, and he manages the business. Mahabubul places the orders for the T-shirts and acts as an intermediary between the Bangladeshi T-shirt suppliers and the U.S. retailers. He also does JK Group's banking and prepares its taxes. Mahabubul works mostly out of his home, using his personal computer and telephone to complete the transactions. JK Group does not have an office, a website, or an email address. It does have two checking accounts, one at Charter Bank and one at Foster Bank, both of which only Mahabubul can access. Any profit that JK Group makes comprises Mahabubul's salary.

Nila, Mahabubul's wife, is the president of JK Group, but according to both Mahabubul and Nila, she does "nothing" for the business. Mahabubul Dep. 7:6-7, Mar. 11, 2010, attached as Ex. B to Pls.' Mot. for Summ. J.; Nila Dep. 7:23-8:1, Mar. 11, 2010, attached as Ex. C to Pls.' Mot. for Summ. J. Nila knows JK Group is a "garments company," Nila Dep. 7:14-16, but she does not know how JK Group conducts its business. As the president, she has not attended any corporate meetings or received a salary, nor does she know anything about JK Group's corporate records. She does not even know whether JK Group is still in business. JK Group has no other employees or officers.

Between January 2006 and December 2007, JK Group wrote Mahabubul checks totaling $198,750, and during that same period, Mahabubul made $1,384,200 in cash withdrawals. JK Group also wrote a $5,000 check to a Lexus dealership near Mahabubul and Nila's home and

four checks totaling $19,900 to Imexco, another apparel importer with which Mahabubul and Nila are involved.[2] In contrast, since April 2009, JK Group's checking account with Foster Bank has been more or less idle, and as of February 2010, the account was completely empty. Mahabubul testified that he was paid about $60,000 – JK Group's annual profits – per year in 2006 and 2007, and he acknowledged JK Group's recent inactivity. Mahabubul Dep. 11:17-12:12:8. Mahabubul said the extensive cash withdrawals between January 2006 and December 2007 were necessary to acquire cashier's checks, which were used to "facilitate a large number of international services that [JK Group] provided for clients." Mahabubul Aff. ¶ 4, Apr. 30, 2010, attached as Ex. A to Defs.' Opp'n to Pls.' Statement of Add'l Facts. Furthermore, he said only some of the checks and withdrawals were used as his personal income. *Id.* ¶ 5. Mahabubul did not explain what kind of international services require these large cashier's checks; how the checks to Mahabubul, which go above and beyond his $60,000 salary, were used; or the purpose of the payments to Lexus and Imexco.

## II.     The Parties' Course of Dealing

In 2005, Ahmed called Mahabubul and offered to sell T-shirts to JK Group using plaintiffs' sales process described above. After consulting with Lee & Lee Enterprises, Inc. ("Lee"), a customer-retailer, JK Group agreed that it would order T-shirts from Bangladeshi factories and sell them to Lee. When Lee received the merchandise, it would have thirty days to pay JK Group, and then JK Group would pay plaintiffs. Since 2005, JK Group placed numerous orders with plaintiffs on behalf of several customers. There were never any written contracts

---

[2] The precise nature of Mahabubul and Nila's involvement with Imexco is unclear. Mahabubul testified that he managed Imexco at the direction of Nila, who, he claimed, is a partial owner of the corporation. Mahabubul Dep. 86:12, 91:13-14. Nila, however, testified that she had never heard of Imexco. Nila Dep. 12:16-18. Nonetheless, it is undisputed that Mahabubul and Nila are involved in Imexco.

between plaintiffs and JK Group. Plaintiffs sent the invoices, bills of lading, and packing lists for the sales to JK Group, and these documents mention JK Group as one of the three "parties to notify" (presumably that the shipment had been made). *E.g.*, Ex. 1 to the Mahabubul Dep. They list prices but no other term relevant to payment obligations.

JK Group placed the nine orders at issue in this case between May 2006 and November 2006. The invoices for the nine sales were similar to those exchanged throughout the parties' course of dealing. Rafiqul Alam, an agent for JK Group in Bangladesh, received these invoices from Ahmed and emailed them to JK Group. The invoices attached to Alam's affidavit differ from those submitted by plaintiffs in that they identify JK Group as the "consignee-buyer" instead of a party to notify. *See* Ex. D to Defs.' Resp. at BJK 000044-BJK 000052.

After it received the shipments at issue, Lee refused to pay JK Group for the merchandise. In 2007, JK Group sued Lee in state court to collect approximately $700,000 owed for orders in 2006. Mahabubul admits that JK Group owed some of this money to plaintiffs. Lee countersued in this court, and the parties eventually reached a settlement agreement on April 30, 2008. *Lee & Lee Enter., Inc.* v. *Kabir*, No. 07-cv-03776 (N.D. Ill. May 8, 2008) (order dismissing case pursuant to settlement).

JK Group claims it also reached a settlement agreement with plaintiffs around the same time, and that "substantial payments were made" to the plaintiffs pursuant to this settlement agreement. Mahabubul Aff. ¶ 16. Between April and August 2007, at least nine wire transfers, totaling $210,000, were sent directly to Panorama Fashion Wear or Ahmed from Mahabubul. Another six wire transfers, totaling $40,000, were made from Mahabubul to Alam between May

5

2007 and February 2008.[3]  Alam was authorized to make payments on Mahabubul's behalf.

Nonetheless, plaintiffs filed suit in this court to recover payments owed for the nine T-shirt shipments.

**ANALYSIS**[4]

**I.      Breach of Contract**

Plaintiffs seek summary judgment that defendants breached an implied-in-fact contract ("implied contract").[5]  In a breach of contract action, plaintiffs bear the burden of showing (1) that a contract exists between plaintiffs and defendant, (2) that plaintiffs performed their obligations under the contract, (3) that defendants did not perform their obligations under the contract, and (4) that damages resulted from the breach.  *Walker* v. *Ridgeview Constr. Co., Inc.*, 736 N.E.2d 1184, 1187, 316 Ill. App. 3d 592, 249 Ill. Dec. 746 (2000).  The existence of a contract is a question of law when the essential facts are not in dispute.  *Baker* v. *Internap Network Servs. Corp.*, No. 09 C 875, 2010 WL 3834003, at *3 (N.D. Ill. Sept. 23, 2010).  Because the existence of an implied contract depends on the parties' behavior and indicated intent, when those matters are disputed, the existence of a contract is left to the trier of fact.  *Id*.

---

[3] Four other wire transfers were made between October 2007 and February 2008 to Alam.  These transfers were from anonymous parties or from an entity called Veltex.  Defendants have presented no other evidence establishing the identity of the senders or their relevance to the current dispute.  Defendants also presented evidence of three other transactions with Ahmed between February and July 2008, but the context of these transactions and their connection with the wire transfers are unclear.

[4] Neither party addresses what law governs this diversity action, and both rely on Illinois law.  Thus, the court will apply Illinois law.  *See, e.g.*, *Wood* v. *Mid-Valley Inc.,* 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal courts sits.").

[5] Although Illinois law differentiates between contracts implied-in-fact and contracts implied-in-law, *In re Marriage of Charnogorsky*, 707 N.E.2d 79, 84, 302 Ill. App. 3d 649, 236 Ill. Dec. 234 (1998), the latter are not at issue in this case.  Therefore, this shortened term should cause no confusion.

An implied contract is one where the essential elements of a binding agreement are inferred from the parties' conduct "in the milieu in which they dealt." *Al's Serv. Ctr.* v. *BP Prods. N. Am., Inc.*, 599 F.3d 720, 726 (7th Cir. 2010) (quoting *Lirtzman* v. *Fuqua Indus., Inc.*, 677 F.2d 548, 551 (7th Cir. 1982)). An implied contract must contain all the elements of an express contract – offer, acceptance, consideration, and a meeting of the minds. *Foiles* v. *N. Greene Unit Dist. No. 3*, 633 N.E.2d 24, 27, 261 Ill. App. 3d 186, 198 Ill. Dec. 562 (1994). These elements can be shown by the parties' general course of dealing. *Yiannis, Inc.* v. *Madison Two Assocs.*, No. 95 C 6704, 1996 WL 680239, at *6 (N.D. Ill. Nov. 21, 1996). Where the terms proposed are understood differently by the parties, there is no meeting of the minds, and no contract can exist between the parties. *Anderson* v. *City of Wood Dale, Ill.*, No. 93 C 425, 2001 WL 477158, at *5 (N.D. Ill. May 3, 2001).

The Uniform Commercial Code ("UCC") governs contracts for sale in Illinois. 810 Ill. Comp. Stat. 5/1-101 *et seq.*; *Razor* v. *Hyundai Motor Am.*, 854 N.E.2d 607, 615, 222 Ill. 2d 75, 305 Ill. Dec. 15 (2006). Under the UCC, a contract for sale may be implied. 805 Ill. Comp. Stat. 5/2-204. Generally, where "goods are offered for sale by one party at prices named in invoices, and the other party, knowing those prices, receives and accepts the goods and exercises acts of ownership over them," a contract for sale may be inferred. *W.J. Voit Rubber Co.* v. *Peoria Coca Cola Bottling Co.*, 280 Ill. App. 14, 18 (1935). Unless the parties agree otherwise, payment in a contract for sale is due on delivery of the merchandise to the buyer. 810 Ill. Comp. Stat. 5/2-310. Parties' course of dealing or course of performance can override this default term. *Frank Novak & Sons, Inc.* v. *Sommer & Maca Indus., Inc.*, 538 N.E.2d 700, 704, 182 Ill. App. 3d 781, 131 Ill. Dec. 325 (1989).

JK Group disputes that it had a contract with plaintiffs because the parties did not agree on the payment terms. Plaintiffs assert that the contract, including the payment terms, was implied from their prior course of dealing. It is undisputed that, since 2005, JK Group had purchased T-shirts from plaintiffs and had sold them to retailers within the United States. The sales arrangement involved plaintiffs shipping the requested merchandise to the United States on loan. Once the merchandise cleared Customs, JK Group delivered the T-shirts to its customer retailers. Then JK Group collected the payment from the customer and paid plaintiffs. Under Illinois law, this conduct, viewed on its own, would imply a contract for sale. *See W.J. Voit*, 280 Ill. App. at 18.

It is less clear, however, that the parties agreed – as required for a valid contract – on the payment terms and responsibilities of the sale. The evidence shows that JK Group agreed to pay for the merchandise. The invoices, packing lists, and bills of lading for the orders mention JK Group as one of three parties to notify, and they were sent to Mahabubul by his agent, Alam. Mahabubul also wrote two letters, outlining delinquent payments that JK Group owed to plaintiffs. Ex. 10 to Mahabubul Dep., Feb. 15, 2008 ("Pls see below is the list of the amount that I owe to all of you for the merchandise they have been [sic] shipped to me and has not been paid."); Ex. 11 to Mahabubul Dep., Oct. 7, 2007 ("I have been purchasing apparel products from these factories on a multi year contract basis."). In these letters, Mahabubul acknowledges that it is his "obligation and responsibility" to pay the debts to plaintiffs. Ex. 10 to Mahabubul Dep. at 2.

None of this evidence, however, establishes when or in what circumstances payment was due. Mahabubul testified that JK Group had no understanding or agreement with plaintiffs as to

how or when they would be paid. Mahabubul Dep. 37:24-38:7, 40:18-19. In his letters, Mahabubul asked to pay the debt on an installment basis or, as an alternative, to return the merchandise to Bangladesh. Ex. 10 to Mahabubul Dep. at 2-3. This shows that he was still negotiating appropriate payment terms in light of circumstances novel to the parties' course of dealing. Notably, there is no evidence that plaintiffs responded to these letters or otherwise communicated their expectations under the terms of the sales. Moreover, plaintiffs have presented no evidence of the timing of payments for previous sales. Mahabubul testified that JK Group paid plaintiffs only after receiving payments from its customers. At least one customer, Lee, was only required to pay JK Group within thirty days of delivery to it, which would be inevitably later than delivery to JK Group. Under this evidence of the parties' course of dealing, plaintiffs could not have expected payment on delivery to JK Group. Thus, plaintiffs must have had some understanding other than the UCC default term in mind. The court finds there is a genuine issue of material fact as to whether the parties agreed on JK Group's payment responsibilities, or put differently, whether there was a "meeting of the minds" as required for a valid contract.[6] *See Anderson*, 2010 WL 3834003, at *5.

Furthermore, even if the court were to assume a valid contract existed, plaintiffs have not met their burden of showing that JK Group breached the contract. Substantial wire transfers were made to plaintiffs between April and August 2007 and possibly as late as July 2008. Mahabubul contends that these payments were pursuant to a settlement agreement made with plaintiffs after the Lee litigation. Mahabubul Aff. ¶ 16. While plaintiffs contest that fact, they

---

[6] Plaintiffs rely on *Waukesha Foundry, Inc.* v. *Indust. Eng'g, Inc.*, 91 F.3d 1002 (7th Cir. 1996), in asserting that there is a contract between the parties. In *Waukesha*, the issue was whether the buyer had agreed to the additional terms provided by the seller's invoices. *Id.* at 1006, 1008. But the issue in this case is whether the parties agreed at all. Thus, *Waukesha* is not controlling here.

9

have made no attempt to explain and have offered no evidence to show the purpose behind the payments. Thus, there is another genuine issue of material fact as to the context of these payments and their relevance to the asserted contract. Plaintiffs' motion for summary judgment will be denied as to the breach of contract claim.

## II. Individual Liability[7]

Under Illinois law, "the shareholders, directors and officers are not, as a general rule, liable for the corporation's obligations." *Jacobson* v. *Buffalo Rock Shooters Supply Inc.*, 664 N.E.2d 328, 331, 278 Ill. App. 3d 1084, 215 Ill. Dec. 931 (1996). This applies even to closely held corporations. *Alpert* v. *Bertsch*, 601 N.E.2d 1031 , 1036, 235 Ill. App. 3d 452, 176 Ill. Dec. 333 (1992). But the doctrine of piercing the corporate veil "imposes liability on *the individual or entity that uses* a corporation merely as an instrumentality to conduct *that person's* or entity's business." *Fontana* v. *TLD Builders, Inc.*, 840 N.E.2d 767, 775-76, 362 Ill. App. 3d 491, 298 Ill. Dec. 654 (2005) (emphasis added). To pierce the corporate veil, two requirements "*must* be met: (1) a unity of interest and ownership that causes the separate personalities of the corporation and the individual to no longer exist; and (2) the presence of circumstances under which adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice or promote inequitable consequences." *Jacobson*, 664 N.E.2d at 338 (citations omitted). Because courts are

---

[7] Plaintiffs briefly contend that Mahabubul was an individual party to the contract because he used individual language ("I," "me," "my," etc.) in his two letters. Plaintiffs do not directly cite legal authority for this argument, but a generous reading shows that they may have relied on *C.B. Mills* v. *Hawranik*, No. 91 C 5797, 1994 WL 113088 (N.D. Ill. Mar. 30, 1994). In *Hawranik*, the court relied on a defendant's use of personal pronouns in contract negotiations to deny summary judgment on the defendant's individual liability. *Id*. at *7-8. But here, Mahabubul's letters came during performance, not during written negotiations, and there is no other evidence that plaintiffs understood Mahabubul to be a distinct party from JK Group. The court has no obligation to develop a party's arguments and will not address this argument further. *United States* v. *Brown*, 899 F.2d 677, 679 n.1 (7th Cir. 1990) (noting that the court does not "construct legal arguments open to parties, especially when they are represented by counsel" (citations omitted) (internal quotation marks omitted)).

10

reluctant to pierce the corporate veil, the party seeking individual liability must make a "substantial showing" that the corporation is a "dummy or sham for another dominating entity." *Id*.

As to the first prong, courts consider many factors in determining whether there is a sufficient unity of interest and ownership to warrant piercing the corporate veil. *Dimmitt & Owens Fin., Inc.* v. *Superior Sports Prods., Inc.*, 196 F. Supp. 2d 731, 738 (N.D. Ill. 2002) (citing *Jacobson*, 664 N.E.2d at 338). These factors include (1) inadequate capitalization, (2) failure to issue stock, (3) failure to observe corporate formalities, (4) nonpayment of dividends, (5) insolvency of the debtor corporation, (6) nonfunctioning of the other officers or directors, (7) absence of corporate records, (8) commingling of funds, (9) diversion of assets from the corporation by or to a shareholder, (10) failure to maintain arm's-length relationships among related entities, and (11) whether the corporation is a mere façade for the operation of dominant shareholders. *Id*. None of these factors, on its own, is dispositive. *Id*.

As to the second prong, in this case, plaintiffs allege that adhering to the corporate fiction would promote injustice. A promotion of injustice requires that plaintiffs show something more than the prospect of an unsatisfied judgment, but they need not show affirmative fraud. *Sea-Land Serv., Inc.* v. *Pepper Source*, 941 F.2d 519, 522-23 (7th Cir. 1991). It is enough to show that a party would be unjustly enriched or that an individual used the corporate façade to avoid creditors. *Id*. at 525.

### A.    Mahabubul Kabir

Both parties seek summary judgment on the issue of Mahabubul's individual liability. Under the first prong, several of the unity-of-interest factors are at issue here: failure to observe corporate formalities, nonfunctioning officers, absence of corporate records, commingling of funds, the diversion of assets, and the façade for a dominant shareholder. The presence of all but two of these factors is undisputed. As discussed below, whether funds were commingled or assets diverted remains unsettled.

First, JK Group failed to observe corporate formalities. It never held corporate meetings because Mahabubul was the sole decision maker, even though Nila was president of JK Group. Mahabubul Dep. 84:4-5 ("Q. So did you ever have corporate meetings? A. There's just me. There's nobody else."). Because defendants presented no evidence of corporate minutes or any written ratification of corporate decisions, the court presumes that they do not exist. *See Wachovia Sec., LLC* v. *Jahelka*, 586 F. Supp. 2d 972, 991-92 (N.D. Ill. 2008); *Dimmit*, 196 F. Supp. 2d at 738 ("An unfavorable evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence which is under its control."). Second, it is clear that Nila was a nonfunctioning officer. Not only did she do "nothing" for JK Group, Nila Dep. 7:7, but she also knew nothing about it. *Id*. 9:23-13:3. She did not even know whether JK Group was in business. *Id*. 12:7-9. It is unclear to this court how a corporate officer could function less than Nila did for JK Group. Next, as indicated by the lack of corporate meetings and minutes, JK Group does not have substantial corporate records aside from its articles of incorporation. Despite the fact that Mahabubul did the corporate accounting and tax preparation, no financial records or tax returns were submitted to the court. Not only is this showing insufficient for the court to conclude that JK Group kept corporate records, the court presumes that it did not. *See*

12

*Wachovia*, 586 F. Supp. 2d at 991-92. Finally, it is clear that Mahabubul is the dominant, if not the only, personality behind JK Group. JK Group has only two employees, Mahabubul and Nila, and as discussed above, Nila does nothing in her role as president and does not receive a salary. In contrast, Mahabubul does "everything" for JK Group: the ordering, the selling, the marketing, the accounting, and the taxes. Mahabubul Dep. 6:14-7:5

As for commingling funds and diverting assets, plaintiffs submitted bank records for JK Group's checking account at Foster Bank. Mahabubul is the only person with access to this account. Mahabubul Dep. 13:5-7. The records show that, between January 2006 and December 2007, JK Group wrote checks to Mahabubul totaling $198,750, and that, during the same period, Mahabubul withdrew $1,384,200 in cash from JK Group's account. This seemingly contradicts Mahabubul's testimony that his salary was approximately $60,000 per year during that time. Mahabubul explained that the cash withdrawals were for cashier's checks, which are necessary for international services to JK Group's clients, but he did not describe those services or clarify why the cashier's checks were required to provide them. Similarly, Mahabubul claimed the checks were not all used for personal income, but he does not detail *how* they were used. The records also show that payments were made to a Lexus dealership and to Imexco, another apparel importer with which Mahabubul and Nila are involved. Furthermore, since April 2009, JK Group's checking account has been relatively inactive and was even emptied by February 2010. The Lexus payment suggests that Mahabubul may have commingled JK Group's funds with his personal assets and used corporate funds to pay personal expenses, and the payments to Imexco, in conjunction with JK Group's recent inactivity, indicate an attempt to divert JK Group's assets to another, liability-free company. Mahabubul gives no explanation for these

13

transactions. He merely argues that they are irrelevant. The court is not persuaded. The possible commingling of funds and diversion of assets is relevant to both the unity of interest prong and to the promotion of injustice prong, as discussed below. Because Mahabubul has failed to present any financial records to rebut plaintiffs' evidence (income tax documents, personal bank records, etc.), the court presumes that such records would show negative results. *See Wachovia*, 586 F. Supp. 2d at 991-92. Therefore, the court finds that plaintiffs have made a substantial showing that Mahabubul and JK Group have a unity of interest sufficient to justify piercing the corporate veil.

Under the second prong, plaintiffs argue that allowing JK Group's corporate shield to stand would promote an injustice. As discussed above, there is evidence that JK Group's assets have been commingled with Mahabubul's personal funds or even diverted to another corporation. Mahabubul has acknowledged that JK Group has unsatisfied creditors, and the handling and eventual emptying of JK Group's account limits the pool from which recovery can be had. Furthermore, the substantial checks written to Mahabubul and his extensive cash withdrawals show that Mahabubul may be unjustly enriched if JK Group is allowed to shield him from liability. Again, Mahabubul submitted no financial records contrary to this evidence. Thus, plaintiffs have shown that allowing the corporate fiction to stand would permit JK Group to escape its creditors or unjustly enrich Mahabubul, either of which would promote injustice. *Sea-Land*, 941 F.2d at 525. Because piercing the corporate veil is appropriate in this instance, the court will grant plaintiffs' motion and deny Mahabubul's motion for summary judgment as to his individual liability.

B.       Nila Kabir

The parties also seek summary judgment on Nila's liability. Piercing the corporate veil is a doctrine used to impose liability on "*the individual* or entity that uses a corporation merely as an instrumentality to conduct *that person's* or entity's business." *Fontana*, 840 N.E.2d at 775-76 (emphasis added). Both parties agree that Nila is president of JK Group in name only. She does "nothing" for the business, Nila Dep. 7:7, nor does she know anything about it. She has not attended any JK Group meetings or approved any corporate decisions. She does not even know whether JK Group is still in business. The most plaintiffs have shown is that she wrote one check on behalf of the corporation. Ex. A to Pls.' Resp. at 000310.

Plaintiffs attempt to piggyback on Mahabubul's management of JK Group by alleging that he was acting as Nila's agent in order to hold her liable as well. Pls.' Resp. to Def.'s Statement of Facts ¶¶ 20-23. But plaintiffs cannot have it both ways – either Mahabubul was calling the shots or Nila was. Nila's inactivity and utter lack of knowledge about JK Group's affairs show that she was not the "dominating entity" behind JK Group. *Jacobson*, 664 N.E.2d at 338. Thus, the court will grant Nila's motion for summary judgment as to her individual liability.

## CONCLUSION AND ORDER

For the foregoing reasons, Nila's motion [#31] is granted. Plaintiffs' motion [#26] is granted as to Mahabubul's liability and denied as to the breach of contract claim and Nila's liability. Mahabubul's motion [#34] is denied. Judgment is entered for Nila. This case will be called for a status hearing on November 18, 2010 at 8:30 a.m. The parties are instructed to

engage in a sincere effort to resolve this litigation and to report on these efforts at the status hearing.

Dated: October 25, 2010　　　　　　　　　　Enter: _____
　　　　　　　　　　　　　　　　　　　　　　　JOAN HUMPHREY LEFKOW
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge